BOUND *v.* SOUTH CAROLINA RY. Co. *et al.,* (QUINTARD, Intervener.)

*(Circuit Court, D. South Carolina.* April 26, 1892.)

NAVIGATION COMPANIES—FORECLOSURE OF MORTGAGE—RECEIVERS—PRIORITY OF CLAIMS.
   The general freight and passenger agent of a navigation company which has passed into the hands of a receiver has a valid claim for the arrears of his salary, but has no equity to be paid in priority to the mortgage creditors. *Fosdick* v. *Schall,* 99 U. S. 235, distinguished.

In Equity. Suit by Frederick W. Bound against the South Carolina Railway Company, the New York & Charleston Warehouse & Steam Navigation Company, and others, for foreclosure of a mortgage. Heard upon the claim of James W. Quintard for preference in payment of his salary.

*D. B. Gilliland* and *Fitzsimons & Moffett,* for intervener.

*A. T. Smythe*, for navigation company.
*Brawley & Barnwell*, for receiver.

SIMONTON, District Judge. ˙ On the 7th October, 1889, by an order of his honor, Judge BOND, D. H. Chamberlain was appointed temporary receiver of the South Carolina Railway Company, at the suit in behalf of holders of second mortgage bonds. At the same time, by the same order, in the same suit, he was directed to take charge, as receiver, of the assets and property of the New York & Charleston Warehouse & Steam Navigation Company. This last-named defendant is a corporation under the law of South Carolina. It had close relations with the South Carolina Railway Company, holding and controlling the connection between its depots and the ocean. The majority of the stock in the navigation company was in the name of the railway company. They had the same president. At the return of the rule to show cause, issued when the temporary receiver was appointed, a large number of the mortgage bondholders and stockholders of the navigation company came before this court, and concurred in the application to make the temporary receiver permanent receiver, against the protest of the president and corporation. This appointment was made. No final hearing has been had in the cause, nor have the exact relations between these two corporations been decided. The New York & Charleston Warehouse & Steam Navigation Company, besides owning wharves and warehouses in Charleston, was authorized by its charter to own or charter steam or other vessels, and to use them in transporting merchandise and passengers between Charleston and New York and elsewhere. 17 St. at Large S. C. p. 628. The company, as such, never owned any vessels, but, being a controlling stockholder in the New York & Charleston Steamship Company, its steamships were used between Charleston and New York, and the petitioner was the general freight and passenger agent of the warehouse and navigation company, stationed at New York. Evidently it was engaged in business as a common carrier. The contract with the petitioner was in writing. The engagement began 1st January, 1886. Its term ended 1st January, 1891, but, after 30th April, 1887, either party could terminate it after six months' notice in writing. Salary, $10,000 per annum. In 1887 all the steamships of the steamship company were sold and taken off the line, the navigation company losing its control over them. In May, 1888, the petitioner, having given the six-months notice required by contract, severed his connection with the navigation company, and brought this action in one of the courts of New York for $5,280.33, about six months' salary. In January, 1890, he obtained a verdict, and entered judgment in the sum of $2,791.66 and costs. He now sets that up. He avers that the navigation company is solvent. It was solvent at the time he contracted with it, and up to the time it went into the hands of the receiver, but the recent loss of all Clyde's business has made it insolvent. At least, its income does not pay its expenses. Interest was paid on its mortgage bonds in January, 1891. No cash dividend has been paid to stock-

holders since 18th March, 1886. Some surplus bonds were divided among them in March, 1887.

The claim of the petitioner is this: He is a creditor, whose contribution kept the navigation company a going concern. After his debt accrued, funds properly applicable to it were diverted to pay bond creditors and stockholders, and he has an equity requiring its restoration. The navigation company, during his service and the accrual of his demand, was a common carrier. He relies upon the current of cases beginning with *Fosdick* v. *Schall*, 99 U. S. 235, there being no difference in principle between the case of a railroad company and this case, the public being interested in keeping the company a going concern.

Before noticing the other questions in the case, this will be met. It has never yet been squarely decided by the supreme court. *Wood* v. *Safe-Deposit Co.*, 128 U. S. 421, 9 Sup. Ct. Rep. 131. But the doctrine of *Fosdick* v. *Schall* has never yet been applied in any case except that of a railroad. Id. Why? All the cases go upon the ground that a railroad is a peculiar property of a public nature, discharging a great public work. No railroad designed for any public benefit can be built without the active interposition and assistance of the sovereign power. It is necessary not only to furnish the money to construct it; it is more essential to secure the land upon which it is to be constructed. This requires the exercise of the right of eminent domain. Without it, money would be powerless. Railroads connect distant points. That they are common carriers is but a small part of their office. They are not only the arteries of trade; they civilize, develop, and enrich large sections of country; cities, towns, and villages, farms and factories, spring up on their line; they make intercommunication of vital importance to thousands; they are the means of transporting troops, munitions of war, and supplies, promoting and preserving tranquillity in times of peace, connecting and creating strategic points in times of war; they are public highways. Public interest, the highest public interest, requires that when constructed they be kept up; be kept, as the phrase is, a "going concern." The cost of building and maintaining them is enormous. Their earnings are fluctuating. The state and national governments so far have not been able to build railroads required by the necessities of our country. Subscriptions to the stock in very few cases furnish money enough to build them. Capitalists are invited to assist in investing in the railroad bonds. So, in order to construct a railroad, two parties must concur,—the stockholders and capitalists, who put in the money and the work; the sovereign power, which contributes the right of eminent domain. Without the money and without this sovereign right, the road cannot be built. The consideration which moves the sovereign to bestow this high sovereign prerogative—the right of eminent domain —is the public use of the railroad, when built; that it remain of use; that it be and remain a going concern. To this end the first application of its earnings must be made. The stockholder subscribes, and the bondholder lends his money, with knowledge of this. Neither of them can get anything until the current expenses are paid. Upon this as-

surance, all persons who furnish labor and supplies are encouraged to give credit to the railroad, and to contribute to keeping it a going concern; and if, perchance, through inadvertence, or for any other cause, any portion of the earnings have been applied to interest or dividends, leaving current expenses unpaid in whole or part, this is a diversion which the court will certainly correct. Railroads are of public concern, not simply because they benefit the public; the sovereign power has contributed to their construction in a way in which none but the sovereign can contribute, and they are devoted to a public use. It does not follow, because other kinds of property are of great benefit to the public, they also come within this category, and are devoted to a public use, and, as such, that the courts will see that they are maintained. "This public use," says Justice BREWER, "is very different from a public interest in the use." *Budd* v. *People,* 12 Sup. Ct. Rep. 478. The public use arises when the sovereign power is essential to the enterprise, and is exercised because of such use. This consideration does not exist in the case of a steamship company, or of any common carrier by water, or of any warehouse company. There are no sovereign, exclusive privileges granted to this navigation company. Anyone can be a common carrier. If the business be profitable, anyone can inaugurate and carry on business between New York and Charleston. The field is open for competition. The act of incorporation is not essential to the business. The public have no special interest in keeping up this company. Of course, the public have an interest in it, as the public have in every kind of business. "No man liveth to himself alone, and no man's property is beyond the touch of another's welfare. Everything, the manner and extent of whose use affects the well-being of others, is property in whose use the public have an interest." BREWER, J., *supra.* But this does not necessarily give the public the right to control such use. The principles established in *Fosdick* v. *Schall,* and the cases following it, do not apply to the case made by the petitioner.

There are other questions made in the case, but for the present let it rest here. Although the petitioner has no equity to be paid in priority to the mortgage creditors, he has a valid claim. Let an order be taken establishing this claim as that of a general creditor, in the amount of the principal and interest and costs of his judgment.