INTERNATIONAL TRUST CO. v. T. B. TOWNSEND BRICK & CONTRACTING CO. (two cases).[1]

(Circuit Court of Appeals, Sixth Circuit. July 5, 1899.)

Nos. 642, 643.

1. JURISDICTION OF FEDERAL COURTS—CITIZENSHIP—PARTIES.

The jurisdiction of a federal court is not defeated in a suit brought only against defendants who are citizens of other states than the complainant because the bill discloses that there are other citizens of the same state with complainant who might properly have been made defendants.

2. APPEAL—RIGHT TO QUESTION EQUITY JURISDICTION—WAIVER.

Where a railroad company filed a bill in equity, alleging its inability to meet its obligations, and praying the court to appoint a receiver to operate its road, and to preserve and administer its property in the interests of its creditors and stockholders, a mortgagee, which entered a voluntary appearance in the suit, and also answered, and contested a petition of intervention filed by a creditor seeking to establish a preferred claim, without questioning the equitable jurisdiction of the court to entertain the suit or the petition of intervention, cannot raise the question of such jurisdiction for the first time on appeal.

3. RAILROADS—PRIORITY OF LIENS—OPERATING EXPENSES.

The doctrine announced in Fosdick v. Schall, 99 U. S. 235, and the cases following it, is that the current income of a railroad is primarily applicable to the payment of its operating expenses, including proper equipment and necessary repairs, and that such expenses are an equitable charge on the income earned during a receivership, though incurred previously by the company, within such reasonable time as shall be fixed by the court, and without regard to whether or not income has been diverted; but the right to such preference extends to income only, and the rule does not authorize a court to displace liens on the corpus of the property in favor of supply creditors, except where, and to the extent that, income which should in equity have been applied to the payment of their claims has been diverted for the benefit of the lienholders, either by the payment of interest therefrom, the purchase of property, or in making permanent improvements on the property; and where there has been no such diversion, either before or during the receivership, and there are no surplus earnings of the receivership, a supply creditor of the company is not entitled to payment from the proceeds of the road, when sold, in preference to the mortgagees.

4. SAME—PERMANENT BETTERMENTS.

A claim against a railroad company for building a bridge on its line, though such bridge constituted a permanent betterment of the property, is not entitled to preferential payment over an existing mortgage from the proceeds of the road when sold under foreclosure.

Appeals from the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

This is an appeal from a decree awarding priority over several pre-existing railroad mortgages to a debt due from the mortgagor company to the appellee for the construction of the pier and abutments of a railroad bridge over the Cuyahoga river in the city of Cleveland, Ohio. This claim was asserted by an intervening petition filed by the appellee in the case of Cleveland, C. & S. Ry. Co. v. Knickerbocker Trust Co., 86 Fed. 73, a cause pending in the cir-

---

[1] Petition for rehearing pending.

cuit court, under which a receiver had been appointed who was in possession and exclusive operation of the railroad against which the intervener's claim was asserted as a preferential lien. The only complainant in the bill under which the receiver was appointed was the Cleveland, Canton & Southern Railroad Company, a corporation of Ohio. The only defendants named in the bill were the Knickerbocker Trust Company of New York, trustee under the ·junior mortgage upon the property, the appellant, the International Trust Company, a corporation of Massachusetts, trustee under five distinct mortgages, all senior to that represented by the Knickerbocker Trust Company, and Clara, William, and Morgan Rotch, executors of William J. Rotch, and citizens of Massachusetts. The object of this bill was to place the property of the railroad company in the custody of the court, that its operation might be continued, and the property, held together, and preserved for the benefit of its creditors. To this end it confessed its inability to meet its floating indebtedness, and provide for its interest obligations, and at the same time meet its ordinary expenses of operation. Its property is described, its mortgages enumerated, and its other liabilities, matured or about to mature, tabulated. Some of its mortgages are stated to cover the entire railroad, while others rest upon parts of the railroad which had been acquired by the complainant subject to existing mortgages. The dismemberment of the railroad is alleged to be threatened, and the consequences to creditors and stockholders averred to be most disastrous. Taxes are said to be due, and mechanics' lien claims are said to threaten immediate disruption of the property. The present inability of the corporation to meet its current operating expenses is averred as necessitating either a stoppage of its operation or the protection of the property by the appointment of a receiver. While no default in the interest of the bonds secured by the mortgages represented by the trustees named as defendants had occurred, the complainant avowed its inability to pay the interest about to accrue. The complainant therefore prayed the court to appoint a receiver for the purpose of preserving the property for the benefit of creditors and continuing the operation of the railroad; that, after paying current expenses, the income be applied to the payment of past-due operating expenses, for labor, material, supplies, rentals, etc., and that "the court will fully administer the trust fund in which the creditors and stockholders of your orator are interested, consisting of its railroad and its properties and assets of every kind, and will, for such purpose, marshal all its assets, and ascertain the several respective liens and priorities existing upon it, and every part thereof, and the amount due upon each and every part of said mortgages or other liens, and enforce and decree upon the rights, liens, and equities of all parties, as the same may be finally ascertained and adjudicated by this court."

Counsel representing the Knickerbocker Trust Company and the executors of Rotch appeared, and consented to the appointment of a receiver, who at once took possession of the railroad, and operated same until the road was sold under decree in separate foreclosure suits begun and prosecuted as independent suits in the same court. When the receiver was appointed, the court authorized him "to pay and discharge out of the net income of said railroad all unpaid traffic balances, and the indebtedness of said company to its servants and employés, and for materials and supplies accruing within six months last past, and also the unpaid coupons, amounting in all to $4,000, due July 1, 1893, on the Coshocton & Southern Railroad line, and mentioned in the said bill of complaint." The International Trust Company was never served with process, or brought before the court through publication or constructive service of any kind. But, shortly after the bill was filed, a general appearance for it was entered upon the rule docket by its counsel, though no answer was ever filed. Thereafter it specially appeared for the purpose of consenting to a decree ordering the issuance of receivers' certificates for the purpose of paying off certain alleged preferential claims adjusted by agreement. Still later it appeared, and answered, and defended the intervention of the appellee, who was seeking to obtain a preference over all the mortgages. On May 16, 1894, the appellee filed the intervening petition upon which the present decree was obtained. This petition alleged that the railroad company, in 1892, had entered into a verbal contract with the T. B. Townsend Brick & Contracting Company for the furnishing of the materials and performing the work and labor for the

building and construction for the railroad company of a stone pier for a draw-bridge over the Cuyahoga river. The terms and conditions of the contract, as averred, were that the said brick company was to be paid by measurement an agreed price for the work and materials, the quantity to be estimated the first of each month as the work progressed by the engineer of the railroad company, and payment of each estimate made on the 20th of each month. That the work was done and materials furnished and estimates made as follows: On December 1, 1892, estimates for $4,758.46; on January 1, 1893, estimates for $2,770.53; on February 1, 1893, estimates for $5,688; on March 1, 1893, estimates for $4,992; on April 1, 1893, estimates for $1,417.50; on July 1, 1893, estimates for $1,327. Under the contract the amounts for which each estimate was furnished was due and payable upon the 20th of the month following the month in which the work was done. None of these estimates were in fact paid, and, when due, the brick company accepted the notes of the railroad company for the amount of each, due six months after date, except in the case of the March estimate, for which a note was made payable in five months. None of these notes were paid. The petition then averred that on the 16th of August, 1893, the said brick company had recorded its account, and claimed a mechanic's lien under the lien law of Ohio "on said structure and the land on which the same is situated, and the railway line and its branches, of which said bridge and appurtenances constitute a part." The petition concluded by praying an enforcement of the mechanic's lien thus fixed, and for such other and further relief, etc.

The International Trust Company appeared, and asked leave to answer and defend this petition, and did file an answer traversing every claim to any lien prior to the pre-existing mortgages under which it was trustee. There was a reference to a master to hear proof and report what was due upon this claim, how much "was done or furnished within six months next prior to the appointment of the receiver, and which should be allowed as one of the six-months claims." The master reported that there was due $20,610.19 on account of the construction of the stone pier, and $1,327 due and payable on account of certain work done in June, 1893, upon certain abutments of the same bridge, done under a subsequent agreement. He also reported that of this work done and materials furnished $6,072.50 was done or furnished within six months prior to the appointment of a receiver. This report was filed February 29, 1896. On June 30, 1896, an amended petition was filed by the said brick company, in which, among other things, it was averred: "That upon the location and site of the said Independence Street Bridge, described in its original intervening petition,—for the erection and construction of the substructure, pier, abutments, masonry, foundations, and approaches thereof and thereto, this intervening petitioner, under the provisions of its said contract with the Cleveland, Canton & Southern Railroad Company, furnished the materials and performed the work and labor set forth and described in its original intervening petition,—there was formerly, and at the time of the making of said contract for the furnishing of said materials and performing said labor, a stationary wooden bridge or structure, which was erected about the year 1880, and had been used continuously since that time by the said the Cleveland, Canton & Southern Railroad Company and its predecessors as a part of its railroad, and to enable it and them to have entrance into the city of Cleveland. That said original bridge, its approaches, abutments, and supports, had become and were weak, decayed, insufficient, and unsafe, and it was hazardous and dangerous for the railroad company's cars and engines to approach or pass over the same; said structure and its approaches, abutments, and supports having been condemned and pronounced unsafe by the engineers of said railway company several years before the making of said contract with this intervening petitioner, and very expensive repairs had been made thereon from time to time, in order to render it at all safe or suitable for railroad purposes. Furthermore, the properly constituted authorities of the city of Cleveland, some time previous to the making of said contract, had formally condemned said bridge, its approaches, abutments, and substructure, on account of its interference with navigation of the Cuyahoga river, said old bridge having no swing or draw, and no central or pivotal pier, but being supported by piling driven in the river bed, upon which the structure stood fixed and stationary, thus obstructing the

channel of the river at this point. Said authorities of the city of Cleveland had therefore directed and required that a bridge with a draw or swing should be constructed, which should not interfere with navigation, and which necessitated, from the nature of the case, the erection and construction of the central pier, abutment work, superstructure, and approaches of and for said swing bridge furnished and constructed by this intervening petitioner as set forth and described in its original intervening petition; said pier and substructure of said bridge, being new structures, and a betterment to and on said railroad. That by reason of the premises it became and was absolutely necessary that said railroad should be improved, bettered, and repaired by constructing said bridge across said river, with its draw pier, abutments, superstructure, and approaches, and by reason of said necessity the contract with this intervening petitioner was entered into, and thereby and thereunder the materials furnished and work done and performed as aforesaid." Thereupon the report of the master was recommitted, with direction to report upon the matters averred in the amended petition. After the master had again reported,—which report was unsatisfactory, as not including a finding touching the character of the old bridge replaced by the new structure, and the necessity for the new structure,—counsel for the parties, to save a re-reference, entered into the following stipulation as to the facts upon which a report was sought, namely:

"The old bridge at Independence street was built in 1880, and was a wooden structure. In 1886 it was re-enforced by overhead trusses. Later it was necessary to support it by piling. In 1892, because of the age and worn-out condition of the bridge, it became necessary, in order to safely operate the road, to replace the old bridge with a new one. On application to the city for permission to put a new bridge over the river, the city required a draw to be put in the new bridge, and refused to permit the old bridge to be replaced by anything but a drawbridge, and thereupon the new bridge, for which the pier was built by the intervener, was constructed, and took the place of the old one. It is stipulated by all the counsel in this case that, in order to avoid a re-reference of this case to the special master, that the foregoing are facts in the case, and may be incorporated by said master in his last report, and have the same force and effect as if this agreement of facts had been made at the hearing before him, and found by him as facts in said case in his said report.
                    "The T. B. Townsend Brick & Contracting Company,
        "By F. A. Durban, C. E. Pannewell and Amos Denison, Its Attorneys.
                    "The International Trust Company,
    "Trustees for First Mortgage Bonds of the Cleveland & Canton R. R. Co.
                    "The Cleveland, Canton & Southern R. R. Co.
                    "The Coshocton & Southern R. R. Co.
                    "The Cleveland, Chagrin Falls & N. R. R. Co.
                    "The Waynesburg & Canton R. R. Co.,
                        "By Garfield & Garfield, Its Attorneys.
                    "The Knickerbocker Trust Co.,
                        "By Williams & Cushing, Its Solicitors.

"This statement is attached to and made part of my report of October 5, 1896, upon the information from Amos Denison, attorney for plaintiff, that all parties in interest have consented thereto as stipulated.
                            "H. F. Carleton, Special Master."

On January 25, 1897, the report of the master was confirmed, there being no exceptions thereto by appellants, and only certain formal exceptions by appellee. January 4, 1899, a decree was entered upon the petition as follows: (1) That the amount due, with interest, to the intervener, was $28,637.45. (2) That of this gross sum $6,072.50 was due for work and materials furnished within six months prior to the appointment of receiver, and that the sum thus due for work done and materials furnished, with interest to the first day of the term, was $7,852.08. (3) That no valid mechanic's lien existed for the security of any part of the work and materials so done or furnished. (4) The court held that the whole of said claim, amounting to $28,637.45, was for work and materials done and furnished to "replace an old, worn-out and unsafe bridge, and that the same was necessary to be done in order that the railroad of the complainant could be safely operated, and continue to transact business in the

city of Cleveland, and that said work and materials materially increased the security of the mortgages held by the said International Trust Company and the said Knickerbocker Trust Company"; that the said claim was, therefore,. "a superior, prior, and paramount lien to the lien of each of the mortgages," and "is entitled to be paid in full from the net income of said property coming into the hands of said receiver, and under the prior orders of this court, properly applicable thereto; and that, if said income be insufficient to pay the said intervener's lien in full, that then the same is entitled to be paid in full from the proceeds of any foreclosure or other sale of the said mortgaged property before any part of said income or proceeds are applied to the payment of any of the bonds or coupons secured by any of said mortgages."

It is conceded that there is no net income in the cause in which this decree was rendered which can be applied to its satisfaction. None of the mortgages were ever foreclosed under that proceeding, but under separate and independent foreclosure suits, filed long after the filing of the administrative suit by the insolvent railroad. No receiver was appointed under these foreclosure suits, nor were they ever consolidated with the suit of the railroad company. Under these independent foreclosure suits the said railroad has been sold under decrees which are stated at the bar to be such as to give the court control over the proceeds of sale and enable it to apply the proceeds first in satisfaction. of any claim entitled to preference over the foreclosed mortgages. To prevent the decree in favor of the T. B. Townsend Brick & Contracting Company from being allowed in the foreclosure suits as a preferential claim, this appeal has. been prosecuted.

Doyle & Lewis, for appellant.

Frank A. Durban (Amos Denison, of counsel), for appellee.

Before TAFT and LURTON, Circuit Judges, and THOMPSON,. District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The appellant has in this court for the first time, so far as the record shows, challenged the jurisdiction of the circuit court to proceed at all under the administrative bill filed by the Cleveland, Canton & Southern Railroad Company. First, it is said that federal jurisdiction did not exist. This is a question which can be raised at any time. But federal jurisdiction did exist. The complainant was a corporation of Ohio. The named defendants were all citizens of New York or Massachusetts. This made a case of jurisdiction upon the ground of diversity of citizenship. Federal jurisdiction would not be defeated by the fact that it appeared upon the face of the bill that there were other creditors of the railroad company who might have been properly made parties, who were citizens of Ohio. To have made them parties would have defeated federal jurisdiction. This result was prevented by refusing to make them parties. If they were necessary parties, the court might refuse to proceed. But that would be for a reason going to the general jurisdiction of a court of equity. Second, it is said that no court of equity could properly entertain jurisdiction of a bill such as that filed by the Cleveland, Canton & Southern Railroad Company. The bill was substantially identical with that filed by the Wabash Railroad Company against its. creditors, of which the court did take jurisdiction. Wabash, St. L. & P. Ry. Co. v. Central Trust Co., 22 Fed. 272; Id., 23 Fed. 513. In Railroad Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, the supreme court refused upon that appeal to consider the question here

raised. The question was one which should have been raised at an early day. It was not raised in the circuit court at all. The court took possession of complainant's railroad, and operated it for years without question. Rights arising under receiver's certificates have accrued. Intervening claimants have come in, and obtained decrees settling their rights, and all this without objection. Counsel for appellant, in their brief, say, "We do not wish to question the validity of receiver's certificates." Indeed, they say "that most, if not all, of them have been issued by consent, and that in the foreclosure suits all such obligations have been or will be recognized and paid out of proceeds of the sale of the railroad." But, however defective in respect to issuable averments that bill may have been, the T. B. Townsend Brick & Contracting Company intervened, and set up a claim of right to priority of satisfaction over the mortgages either as a mechanic's lien or one entitled to preference upon the equities of the case. Now, this was an issue tendered to the mortgagees. The appellant says it had not theretofore been a party, and only put in a special appearance for the purpose of consenting to a particular decree. This is a mistake. On October 12, 1893, counsel for the International Trust Company entered a formal and general appearance upon the rule docket. Subsequently it appeared, and asked leave to answer and defend this intervention of the Townsend Brick & Contracting Company, and, upon leave granted, did answer. It is said that it was trustee under five mortgages, and became defendant only in respect to its junior mortgage, and that it ought not to be affected by any decree in respect to the other mortgages in which it was trustee. Neither the original appearance nor application for leave to appear and defend the petition of the intervener was so limited. The answer filed to the intervening petition, while slightly dubious, seems to be an answer by it as trustee in all the mortgages sought to be displaced by the claim of the Townsend Brick & Contracting Company. The stipulation as to evidence, set out in the statement of the case, was signed by the appellant as trustee under all of its mortgages. Under all the facts, it is too late for appellant to deny jurisdiction over it in respect to all of its mortgages, and too late for it to question the equitable jurisdiction of the court under the original bill, and more especially the jurisdiction of the court to decide the issues presented by the intervening petition of the appellee. Whether the railroad company, as an insolvent corporation, might, upon its own bill, place its property in charge of a court of equity for the purpose of having its property preserved and administered for the benefit of its creditors, and in the meantime operated for the benefit of the public and its creditors, is a question which need not now be decided. It is enough, for the purposes of this case, to say that the appellant voluntarily appeared and made itself a party to the issue presented by the intervening petition of the Townsend Brick & Contracting Company, and did not in any way challenge the equitable jurisdiction of the court to entertain either the administrative suit filed by the railroad company or the intervening petition of a creditor which sought, by the issue tendered in its pleadings, to establish its right to a superior lien in the property im-

pounded over each and every one of the mortgages existing thereon.

The appellee sought a preference in the payment of its claim in whole or part upon several distinct grounds:

First. That a mechanic's lien existed, which entitled it to payment in preference to the pre-existing mortgage debts. The circuit court denied relief upon this ground—First, because the intervener ·had not perfected a mechanic's lien under the Ohio lien law of April 10, 1884, by filing its lien claim within 40 days after completion of the work, and by giving notice within 10 days after the claim was filed, as provided by that act; and, second, because, if any lien was secured by the proceedings taken, it was subordinate to pre-existing mortgages. We agree with the court below in denying any relief under the mechanic's lien law of Ohio as against the mortgage debts. We think no lien was perfected under the act of 1884, and that, if mistaken in this, such lien would be subordinate to the antecedent mortgages. Railroad Co. v. Hamilton, 134 U. S. 296, 302, 10 Sup. Ct. 546.

Second. Relief was sought upon the theory that the claim was one for a debt incurred by the railroad company for work and materials indispensable to the continued operation of the railroad, and therefore entitled to be paid as a preferential claim superior to the mortgages existing when the debt accrued. The debt was incurred for the construction of a stone pier and abutments for a railroad drawbridge. The facts concerning the necessity for the structure are shown by a stipulation, which was as follows:

"The old bridge at Independence street was built in 1880, and was a wooden structure. In 1886 it was re-enforced by overhead trusses. Later it was necessary to support it by piling. In 1892, because of the age and. worn-out condition of the bridge, it became necessary, in order to safely operate the road, to replace the old bridge with a new one. On application to the city for permission to put a new bridge over the river, the city required a draw to be put in the new bridge, and refused to permit the old bridge to be replaced by anything but a drawbridge, and thereupon the new bridge for which the pier was built by the intervener was constructed, and took. the place of the old one."

If, on this state of facts, this debt be regarded as an indebtedness incurred in the ordinary business of operating the railroad, and in the expectation that it would be paid out of the current earnings of the railroad, only such of the debt as accrued within six months prior to the appointment of the receiver should have been held as a charge upon the surplus income of the receivership. The contract under which the work was done provided that it should be paid for as it. progressed, upon estimates furnished by the railroad company's engineer on the 1st of each month, such estimates being payable on the 20th of the current month. The master reported that such estimates were furnished, beginning with December, 1892; the last being furnished in July of 1893. For the amount due upon each ·estimate the promissory note of the company was executed, payable in six months after date, with interest. The whole amount of the claim, without interest, was, as shown by the master's report, $20,610.19, of which, the master reported, $6,078.50 was for work done within six months prior to the appointment of the receiver, and this part of the claim was reported as coming within the order of the court direct-

ing the receiver "to pay and discharge out of the net income of the said railroad all unpaid traffic balances, and the indebtedness of said company to its servants and employés, and for materials and supplies, accruing within six months last past." This report was upon a reference to ascertain and report "how much, if any, of said work and material furnished by said Townsend Company for the construction of said bridge, was done or furnished within the six months next prior to the appointment of the receiver herein, and which should be allowed as one of the six-months claims." The report was unexcepted to by either party, except in certain matters now of no moment, and was confirmed January 25, 1897, the final decree appealed from not having been made until June, 1898. For some inexplicable reason, when the court came to hear the cause finally, the whole of the claim was allowed as a debt entitled to be paid out of the net income of the receivership, and, in default of such income, out of the proceeds of any foreclosure sale, in preference to the mortgage debts. This was error. If this claim was of the class of debts chargeable at all upon the surplus income arising under a receivership as against the rights of prior mortgagees,—a point which we do not find it necessary to decide,—there was no reason for preferring it over other debts of the same class, and no reason for departing from the order made in respect to such debts of the income, and under which the income had been distributed.

The equity in favor of such claims grows out of the fact that they are debts incurred during the current operation of the railroad, and for necessary labor or supplies to maintain it in operation, and under circumstances which support the presumption that the expectation was that they would be paid out of the current income. If credit is given by agreement upon such claims for a time which indicates that there was no expectation that the current earnings were to be applied in their payment, or they are allowed to stand unsettled, and without suit, for such a time as indicates that the creditor has ceased to look to current earnings, he will be regarded as a simple unsecured creditor, relying alone upon the general credit of the company, and not upon the interposition of a court of equity. In this circuit six months has been generally regarded as a sufficient time to go back and charge such claims upon the income of a receivership, and this court gave its approval to that rule in the case of Belknap v. Trust Co., 47 U. S. App. 663, 26 C. C. A. 30, and 80 Fed. 624. There was no reason for departing from the time limit under which the court had administered this receivership. But there was no "net income" subject to the order of the court out of which even that part of said claim which accrued within six months could be paid. Neither were there any proceeds arising from foreclosure of the mortgages under this bill out of which this decree could be satisfied. The mortgagees did not foreclose their mortgages in the administrative suit in which the brick company had intervened, and in which the present decree was pronounced. There had been no default in the payment of interest upon any of the bonds secured by the mortgages to the International Trust Company when the railroad company filed its bill, and none occurred for some time thereafter. When default did occur, the

mortgagees filed independent foreclosure suits in the same court, and, without obtaining a receiver, or consolidation with the bill of the railroad company, obtained foreclosure decrees, under which the railroad had been sold when the decree here appealed from was entered. The foreclosure decree provides, however, that the court in that case might apply the proceeds of sale to the satisfaction of claims entitled to priority over the foreclosed mortgages upon presentation and establishment of such claims in that case before final distribution of the fund. Thus the question as to the power of the court to displace mortgage liens in favor of the claim here established is not different from what it would be if the Townsend Brick & Contracting Company had filed an independent bill against the railroad company and its mortgagees, and sought a decree enforcing its claim as a lien superior in character to that of mortgage debts antecedent to it in origin and priority of lien. The theory upon which this claim is asserted as a superior lien is that it is for an indebtedness which was incurred by the railroad company as a necessary and indispensable operating expense, without which it could not have continued the operation of the railroad, and that indebtedness so incurred constitutes an equitable charge upon the corpus of a railroad, superior in lien to pre-existing mortgages; and that this is the principle settled by Fosdick v. Schall, 99 U. S. 235, and the cases following that. This contention is founded upon a total misconception of the principles announced in Fosdick v. Schall, and applied so frequently in cases subsequent to that. It is now too well established to be longer debated that the income of a mortgaged railroad company out of which the interest or principal of the mortgage debt may be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and necessary repairs. The surplus of earnings thus ascertained, and this only, constitutes income properly applicable to the mortgage debt. "And this is so," says Justice White, in Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 365, 18 Sup. Ct. 663, "even though the mortgages securing the lands provided for the sequestration by foreclosure of the income of the road for the benefit of the bondholders." This doctrine that the "current earnings" of a mortgaged railroad are applicable primarily to the payment of the current debts made in the course of the ordinary operation of the railroad, arises partly out of the public interest in the maintenance of such a highway for the public use, and partly out of the necessity for such expenditures for the preservation of the property for the benefit of those having liens thereon. The peculiar character of the property and the public character of its use have led to the conclusion that "every railroad mortgagee, in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income." Fosdick v. Schall, 99 U. S. 235, 252; Miltenberger v. Railroad Co., 106 U. S. 286, 311, 312, 1 Sup. Ct. 140; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675; Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 365, 369, 18 Sup. Ct. 657. This implied agreement that the current

income shall be first applied to the payment of current operating expenses operates to create in favor of such debts for current expenses as were incurred in the expectation that the current earnings would be applied in their payment an equitable charge upon what Chief Justice Waite calls "the current debt fund." "If," says the chief justice, in Fosdick v. Schall, supra, "for the convenience of the moment, something is taken from what may not improperly be called the 'current debt fund,' and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income, and hold it for their benefit, to require, as a condition of such an order, that what is due from the earnings to the current debt shall be paid by the court from the future current receipts, before anything derived from that source goes to the mortgagees." Touching the grounds upon which such claims might displace a mortgage lien upon the corpus, the learned chief justice in the same case said:

"The power rests upon the fact, that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or a part of the general creditors. Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that if there has been in reality no diversion, there can be no restoration; and that the amount of restoration should be made to depend upon the amount of the diversion."

The doctrine, as thus stated, is the foundation of the "diversion" or "restoration" doctrine applied in the later cases of Burnham v. Bowen, Miltenberger v. Railroad Co., and Virginia & A. Coal Co. v. Central Railroad & Banking Co., cited above. Independently of any diversion of current income by the mortgagor company, this equitable right of the supply claimants to be paid out of income has been held to extend to the income arising under a receivership. The result of the cases has been very admirably summed up in the opinion of the supreme court delivered by Justice White in Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 365, 18 Sup. Ct. 661, where it is said:

"It was thus settled that, where coal is purchased by a railroad company for use in operating lines of railway owned and controlled by it, in order that they may be continued as a going concern, and where it was the expectation of the parties that the coal was to be paid for out of current earnings, the indebtedness, as between the party furnishing the materials and supplies and the holders of bonds secured by a mortgage upon the property is a charge in equity on the continuing income, as well that which may come into the hands of the court after a receiver has been appointed as that before. It is immaterial in such case, in determining the right to be compensated out of the surplus earnings of the receivership, whether or not during the operation of the railroad by the company there had been a diversion of income for the benefit of the mortgage bondholders, either in payment of interest on mortgage bonds or expenditures for permanent improvements upon the property. Nor is the equity of a current supply claimant in subsequent income arising from the operation of a railroad under the direction of the court affected by the fact that while the company is operating its road its income is misappropriated, and diverted to purposes which do not inure to the benefit of the mortgage bondholders, and are foreign to the beneficial maintenance, preservation, and improvement of the property."

In Belknap v. Trust Co., 47 U. S. App. 663, 26 C. C. A. 30, and 80 Fed. 624, this court, after a consideration of the cases of Fosdick v. Schall, 99 U. S. 235; Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675; Kneeland v. Trust Co., 136 U. S. 89, 10 Sup. Ct. 950; and Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. 824,—said:

"From these cases it may be deduced that in respect of railroad mortgages there is an implied agreement that all proper operating expenses of such companies while under control of the mortgagors are to be paid out of current receipts, and that any diversion of such income, by which current operating expenses are left unpaid, is a misappropriation of the income, and upon a proper showing the mortgagees receiving the benefit will be required to reimburse the fund applicable to the payment of these 'debts of the income,' to the extent of the diversion."

But, if there has been no diversion of the current income, either before or after the appointment of a receiver, and no "surplus income" during the receivership, out of which unpaid debts of the income can be paid, upon what theory can the proceeds of a mortgage foreclosure sale be applied to the payment of such debts against the objection of mortgage creditors? If nothing has been diverted from the "current debt fund," if there has been no augmentation of the fund applicable primarily to the satisfaction of the mortgage creditors, is there any just or equitable reason for requiring a restoration where nothing has been improperly received? We think in such cases the court has no power to displace contract rights, and neither Fosdick v. Schall nor any of the cases which have followed it afford any sufficient authority, when rightly understood, in opposition to this view. These "debts of the income" are an "equitable charge" only upon the "current income" of the mortgaged railroad. If such debts remain unpaid when the railroad passes into the possession of a court of equity, this "equitable charge" is continued, and attaches to the "surplus income" arising under the receivership. If this surplus income is not applied to the payment of the debts to which it is primarily devoted, but is expended for the benefit of the mortgagee, as in payment of interest, or in the purchase of property which passes under the mortgage, or in betterments of the railroad itself, an equity arises, as a consequence of such diversion, which will justify a court of equity in requiring the mortgagees to restore to the income that which has been taken away. The power of the court to displace mortgage liens in favor of such unsecured debts of the mortgagor depends upon the fact that the current income, either before or after the receivership, has been diverted to the benefit of the displaced mortgage, and the extent to which the corpus of the mortgaged property can be called upon to pay such debts of the income is limited by the amount of the diversion.

Fosdick v. Schall, supra, has been cited and relied upon as sanctioning the idea that, without regard to the question of misapplication of income, claims of the class called "preferential" constitute a charge upon the corpus of a mortgaged railroad if the income, either before or after a receivership, is insufficient to pay them. This is a misconception of that case. What the court there said was this:

"While, ordinarily, this power is confined to the appropriation of the income of the receivership and the proceeds of moneyed assets that have been taken from the company, cases may arise where equity will require the use of the proceeds of the sale of the mortgaged property in the same way. Thus it often happens that in the course of the administration of the cause the court is called upon to take income which would otherwise be applied to the payment of old debts for current expenses, and use it to make permanent improvements on the fixed property, or to buy additional equipment. In this way the value of the mortgaged property is not infrequently materially increased. It is not to be supposed that any such use of the income will be directed by the court, without giving the parties in interest an opportunity to be heard against it. Generally, as we know both from observation and experience, all such orders are made at the request of the parties, or with their consent. Under such circumstances it is easy to see that there may sometimes be a propriety in paying back to the income from the proceeds of the sale what is thus again diverted from the current debt fund in order to increase the value of the property sold. The same may sometimes be true in respect to expenditures before the receivership."

In that case the court refused to pay the debt of such a claimant, saying:

"There is nothing to show that the current income of the receivership or of the company has been in any manner employed so as to deprive this creditor of any of his equitable rights. In short, as the case stands, no equitable claim whatever has been established upon the fund in court. Prima facie that fund belongs to the mortgage creditors, and the presumption which thus arises has not been overcome. Schall, for the balance, his due, after his own security has been exhausted, occupies the position of a general creditor only."

In Burnham v. Bowen, 111 U. S. 776, 781, 782, 4 Sup. Ct. 675, Miltenberger v. Railroad Co., 106 U. S. 286, 311, 312, 1 Sup. Ct. 140, Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809, as well as in Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 365, 18 Sup. Ct. 657, there appeared the fact either that income had been applied to the purchase of property which passed under the mortgages, or to the payment of interest on the mortgage debts, or to "betterments" upon the mortgaged property. That this misapplication of the surplus income of the receivership was the ground for paying a supply claim out of the proceeds of the sale of the mortgaged property is made plain by what is said by the court in Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 365, 18 Sup. Ct. 663, where the court, after considering the evidence as to the appropriation of receiver's earnings to the payment of an installment of interest, and reaching the conclusion that the evidence left the question in doubt, said:

"Whether, however, there was a diversion of income before the receivership, inuring to the benefit of the bondholders, the equity in favor of the coal company for payment out of subsequent income, as we have seen, survived, and attached to the property when it was taken possession of by the receiver; and if a surplus of income was created by the operations of the road under the receiver, sufficient to satisfy the claims of the interveners, the right to demand that the surplus income be applied in satisfaction of the claims in question was undoubted. From the evidence we find that there was such surplus. It was stipulated in the record as a fact 'that since the receivership the receivers of the Central Railroad & Banking Company of Georgia have expended for betterments on its railroad lines from the income of the roads during the receivership a sum much larger than the entire claim of the interveners.'"

The case of Trust Co. v. Morrison, 125 U. S. 591, 8 Sup. Ct. 1004, is supposed to lend some countenance to the theory that the court has the power to displace mortgage liens in favor of debts incurred by the mortgagor for the preservation of mortgaged property, irrespective of the question of a diversion of income to the beneficial purposes of the mortgagees. Some of the reasoning of the court may be regarded as lending support to such a contention. But the decision in that case was declared by the court to rest not alone upon Morrison's intervention to save the mortgaged property, but upon that "and the other circumstances of the entire case taken together." 125 U. S. 591, 612, 8 Sup. Ct. 1004. Among these circumstances was the all-sufficient one that the receiver had applied for and obtained a decree allowing him, out of the surplus income, to protect Morrison and others who had become sureties in suits instituted to protect the mortgaged property against the execution levies of unsecured creditors. The mortgagees, through their trustee, were parties to the suit in which this order was made, and made no objection. The receiver did not pay this claim, and gave as a reason that the income was insufficient. The court, however, found that income had been used by the receiver in the purchase of "new property, real estate, and rolling stock," and that this property into which income had been diverted had passed under the mortgage and into the hands of the mortgagees, as purchasers, at the foreclosure sale. This court, in Whitely v. Trust Co., 43 U. S. App. 643, 647, 22 C. C. A. 67, and 76 Fed. 74 et seq., had occasion to distinguish Trust Co. v. Morrison. Neither does Jones v. Lyerly, 43 U. S. App. 224, 19 C. C. A. 569, and 73 Fed. 568, conflict with the view we now express as to the ground upon which a court of equity may displace a mortgage upon the corpus of a railroad. The liability there enforced as a preferential claim was one incurred at the request of the trustee under the mortgage, and for the protection of the trust. The language of this court in Belknap v. Trust Co., 47 U. S. App. 663, 672, 26 C. C. A. 30, and 80 Fed. 624, that the necessary operating expenses of a mortgaged railroad constituted a charge upon the income in the hands of a receiver, "and, if necessary, upon the corpus of the property," was inadvertent, and had no application to any question arising upon that appeal. The debts which sought payment out of proceeds of sale in that case were disallowed as not proper "debts of the income." The necessity for charging such debts upon the corpus of the property can only arise when the income before or after the receivership has been applied to the beneficial purposes of the mortgage debt displaced.

Under the doctrine of the cases we have been considering there is no justification in the case at bar for a displacement of the mortgage lien. The intervening petition did not allege that there had been any diversion of income either before or after the appointment of a receiver. No issue of this nature being presented by the pleadings, evidence would have been irrelevant. Irrespective of any diversion, claims of the class to which this claim is supposed to belong were ordered to be paid out of the "net income" of the receivership, which was the only fund which could have been devoted to

their payment, unless a case was made which would justify the court in compelling the mortgagees to augment that fund by restoring to it income which had been improperly diverted therefrom. To justify a decree displacing the mortgage liens, there should have been such averments of fact as would have made an issue. Aside from this fatal defect in the pleadings, there was no evidence which would support a decree for a restoration, and the decree of the court was not placed upon any such ground, but distinctly upon the ground that such a claim was entitled to preference over the mortgage debts, irrespective of any diversion of income before or after the appointment of a receiver. To quote from Fosdick v. Schall, supra:

"There is nothing to show that the current income of the receivership or of the company has been in any manner employed so as to deprive this creditor of any of his equitable rights. In short, as the case stands, no equitable claim whatever has been established upon the fund in court. Prima facie that fund belongs to the mortgage creditors, and the presumption which thus arises has not been overcome."

To the extent that appellee can obtain satisfaction of that part of its decree which is for work done within six months prior to the receivership, he must look to the "net income" unexpended, and in the hands of the court. As to the rest of the claim, appellee is a general creditor, and has no right to satisfaction at the expense of the mortgagees. The mere fact that the work done by appellee has tended to conserve the railroad, or to enhance the value of the property to the mortgagees, is no ground for displacing the lien of the mortgages which covered the property when the work was done and the bridge pier constructed. Railroad Co. v. Cowdrey, 11 Wall. 460; Thompson v. Railroad Co., 132 U. S. 68, 74, 10 Sup. Ct. 29; Railroad Co. v. Hamilton, 134 U. S. 296, 301, 10 Sup. Ct. 546; Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 195, 11 Sup. Ct. 61.

In Thompson v. Railroad Co., supra, a claim for a preference over the mortgage for moneys used in the construction of the road included under the mortgage was denied, the court saying:

"In Railroad Co. v. Cowdrey, 11 Wall. 460–481, it was contended that priority should be given to the last creditor for aiding to conserve the road. But the court answered that this rule had never been introduced into our laws except in maritime cases, which stand on a particular reason; that by the common law whatever is affixed to the freehold becomes part of the realty, except certain fixtures erected by tenants, which do not affect the question; and that the rails put down upon the company's road become a part of the road. Here the same rule applies; and not only the rails, but those permanent fixtures which are essential to the successful operation of the road, become a part of the property of the company, as much so as if they had existed when the mortgage was executed."

In Railroad Co. v. Hamilton, cited above, a debt contracted for the construction and erection of a dock upon the mortgaged property of the railroad company was allowed priority by the circuit court upon the ground that the improvement to the railroad property gave an equitable right to priority of payment. The supreme court reversed the decree, saying:

"It is true, cases have arisen in which, upon equitable reasons, the priority of a mortgage debt has been displaced in favor of even unsecured subsequent creditors.   *   *   *   But those principles have no application here.  The work which Hamilton did was in original construction, and not in keeping up, as a going concern, a railroad already built.  The amount due him was no part of the current expenses of operating the road.  There was, to him, no diversion of current earnings to the payment of current expenses."

In Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 195, 11 Sup. Ct. 69, a preference was denied over the mortgage debts for a claim for money advanced or loaned the railroad company to be used for taxes, operating expenses, equipment, improvements, and other necessary expenditures, by which, it was averred, the Texas Central Railway has been kept in repair, and a going concern, and thereby rendered more valuable to the first mortgage bondholders.  It appeared in that case that the current earnings were sufficient to pay the operating expenses and taxes, and that the deficit was produced by the payment of interest on the bonded indebtedness.  The court, touching this aspect of the case, said:

"By the payment of interest the interposition of the bondholders was averted. They could not take possession of the property, and should not be charged with the responsibility of its operation.  It is true that a railroad company is a corporation operating a public highway, but it does not follow that the discharge of its public duties excuses it from amenability for its private obligations.  If it cannot keep up and maintain its road in a suitable condition, and perform the public service for which it was endowed with its faculties and franchises, it must give way to those who can.  Its bonds cannot be confiscated because it lacks self-sustaining ability."

The decree must be reversed in so far as it gave to the T. B. Townsend Brick & Contracting Company a lien in preference to the mortgages under which the International Trust Company is trustee, and modified in so far as it allowed payment out of the "net income" arising under the receivership of any part of the debt which accrued more than six months prior to the appointment of the receiver according to the master's report.  Appellee will pay the costs of the appeal and of this court.