## LEE v. PENNSYLVANIA TRACTION CO. et al.

(Circuit Court, E. D. Pennsylvania. December 24, 1900.)

### No. 32, October Sessions, 1896.

**1. STREET RAILROADS—FORECLOSURE OF MORTGAGE—PREFERENTIAL DEBTS FOR SUPPLIES.**

A claim against a street-railroad company for the purchase price of rail joints and track bolts furnished to the company within six months before it went into the hands of a receiver in foreclosure proceedings, which is so moderate in amount as to show that the supplies were purchased for repairs and not for reconstruction, is one for day by day supplies, necessary to keep the road in operation as a going concern, and to maintain its earning capacity and preserve its franchise, and is entitled to preference of payment over the mortgage debt from the earnings of the receivership or the proceeds of the property when sold, independently of any question of the diversion of income.

**2. RAILROADS—INSOLVENCY—PREFERENTIAL DEBTS FOR SUPPLIES.**

When a railroad corporation becomes in fact insolvent, one result is to make the mortgage bondholders the real owners of the property, and to charge them with the obligation to keep it a going concern, that it may continue to discharge its duties to the public and the value of the security may be maintained. Hence, so long as they permit the insolvent company to remain in control, it may properly be regarded as their agent for that purpose, and to contract for the necessary day by day supplies, to be paid for from the current income, or, if necessary, from the proceeds of the property when sold, in preference to the mortgage debt. But such implied authority does not go beyond the obligation to preserve the property and maintain it in operation, and for that reason the courts recognize a practical distinction between claims for supplies necessary for that purpose, and those for supplies or materials purchased for reconstruction or to make substantial betterments.

In Equity. On exceptions to master's report.

Benjamin H. Lowry and Lynch, Day & Day, for exceptions.
Samuel Dickson, opposed.

J. B. McPHERSON, District Judge. The Pennsylvania Traction Company, which leased and operated a system of electric railways in and around the city of Lancaster, went into the hands of a receiver a few years ago, and its property and franchises were afterwards sold under foreclosure. The decree confirming the sale required the purchaser to pay "any unpaid indebtedness or liability contracted or incurred by the defendant, the Pennsylvania Traction Company, in the operation of the mortgaged property prior to the appointment of the receiver, and which is prior in lien or superior in equity" to the mortgages under which the sale was made, except such indebtedness or liabilities as should be paid or satisfied out of assets or the proceeds of assets. No assets or proceeds of assets were applied to the payment of the Cleveland Axle Manufacturing Company's claim, which was for rail joints and track bolts furnished to the traction company within six months before the appointment of the receiver; and accordingly the axle company asked the master, by whom the proceeds of sale were distributed, to declare that its claim was entitled to a preference out of the corpus of the property, and to recommend a decree requiring the purchasers to pay the

claim in full. The master denied the claimant's right to be thus preferred, and the correctness of his ruling is the point for decision.

It is found as a fact by the master that the claim was for "supplies furnished to the Pennsylvania Traction Company, necessary for the operation of its railways, within six months prior to the receivership"; and it also appears from the report that:

"There is no evidence of any diversion of income by the Pennsylvania Traction Company, prior to the receivership, to betterments of the property or interest on the bonds. During the receivership the receiver did not receive sufficient income to operate the road and pay all the receiver's certificates issued therefor. The proceeds of the foreclosure sale of the mortgaged properties were not sufficient to pay the taxes due; the proceeds of the sale of the property included in the mortgage of January 5, 1894, being $5,000, and the taxes alone, $20,041.16, and [the proceeds of the sale of the property] included in the mortgage of April 5, 1894, being $25,000, and the taxes, $20,041.16; receiver's certificates otherwise unpaid, $3,933.13; and fees of counsel of trustee and receiver in Philadelphia and Lancaster, $8,125."

From these facts it is clear that the equity of the axle company cannot be put upon the ground that income had been diverted from the current expense fund, out of which fund the creditor might have reasonably expected to be paid, and had been used for the benefit of the bondholders, either in bettering the traction company's property, or in paying interest on the bonds. The class of cases of which Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, is the leading example, do not afford the claimant any aid, and, indeed, they are not appealed to for support. The claimant's argument is that the supplies in question were day by day supplies, necessary for the operation of the road, and that the principle on which the equity to be preferred may safely rest is this: Such supplies were necessary to keep the property a going concern and to maintain its earning capacity, without which the security of the bondholders would have been of comparatively little value. I think the argument is sound. Without frequent supplies such as these, a railway in active operation would soon fall into disrepair and decay, its business as a carrier would be seriously impaired, its capacity to earn profits would be greatly diminished, and the value of its franchise—which is, after all, the principal asset of this class of corporations—would be much depreciated, leaving to the bondholders little more than the cars, rails, power house, and appliances. The material property is worth little by itself, apart from its connection with the franchise.

These reasons, I think, need not be much elaborated. To my mind they are persuasive of the claimant's equity; and I see no serious difficulty in the objection that similar reasons may be given for allowing a preference to debts created for reconstructing the track, or rebuilding the power house, or restocking the road with cars. Logically, I concede that little essential difference may exist between an outlay for 20,000 tons of steel rails to replace a worn-out track, and an outlay for a ton or two of bolts and nuts to keep a good track in repair, but practically there is much difference, when the rights of prior mortgage creditors come to be considered; and the courts have stood fast by the practical distinction. They have not permitted such claims to take precedence of a prior mort-

gage, if the claims have been so large that reconstruction, and not repair, was evidently the object, or if the supplies were furnished at so remote a time that they could not be fairly regarded as having been sold in reliance on the current expense fund for payment. These practical rules are to be applied in each case with due regard to the particular circumstances in evidence, and a claim may be properly preferred if the supplies have been recently furnished, and if the quantity is small enough to show that the transaction was a mere preservation of the earning capacity of the road,—merely had in view the road as a going concern,—and was not in reality a partial restoration or reconstruction of the plant.

Perhaps the reason for allowing a preference to claims for repairs, and disallowing a preference to claims for reconstruction, may be stated as follows: When a railway corporation becomes insolvent, which is usually a considerable time before the appointment of a receiver, one result of the insolvency is to make the mortgage bondholders the real owners of the property. Legally, of course, there has been no change of title, but essentially the property now belongs to the bondholders. Save in rare instances, they afterwards acquire the legal title by a foreclosure sale; but, even if other purchasers ultimately buy the property, insolvency puts the substantial ownership where the property or its proceeds must finally go. This being so, it is the bondholders' railway, rather than the corporation's, that is now to be maintained, so that it may continue to discharge its duty to the public, and so, also, that its value as a security for the bonds may not be impaired. To maintain the road in efficiency would be an obligation falling immediately on the bondholders, if the insolvency of the corporation was immediately followed by the consequence that follows ultimately in one form or another, namely, the transfer of the property to the bondholders. If the transfer were formally made, it would be necessary for the bondholders to pay out their own money for necessary day by day supplies; and therefore—the transfer being made in substance, although not in form—it is just to require them to pay for such supplies as have been furnished by others in their stead. I do not mean that a volunteer would acquire an enforceable claim by furnishing supplies. Such a situation is not likely to arise, and does not arise in the ordinary case, where supplies are ordered by the corporation. The insolvent company may properly be regarded as the agent of the bondholders in keeping the railway a going concern, and to this end in contracting for the needful material. Especially may it seem proper thus to regard the corporation, if it is considered that insolvency gives the bondholders the right to step in and assert their claim upon the property, and therefore that the failure thus to intervene justifies the inference that they were content to have the corporation go on and act on their behalf.

I think, also, that to look upon the bondholders as the real owners from the time when insolvency sets in furnishes a sufficient reason for denying a preference to creditors who have gone beyond the mere keeping up of the property, and have furnished the means to reconstruct it in whole or in some substantial part. This is going

too far in dealing with the property of another. It is evidently not mere preservation, which may be a permissible act, but is substitution, which may be against the owner's will, and may thus compel him to take what he does not want.

I think these views find support in Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117, and the class of cases to which it belongs. To quote a passage from page 311, 106 U. S., page 162, 1 Sup. Ct., and page 127, 27 L. Ed., that has since been several times repeated:

"Many circumstances may exist which may make it necessary and indispensable to the business of the road and the preservation of the property for the receiver to pay pre-existing debts of certain classes out of the earnings of the receivership, or even the corpus of the property, under the order of the court, with a priority of lien. Yet the discretion to do so should be exercised with very great care. The payment of such debts stands, prima facie, on a different basis from the payment of claims arising under the receivership, while it may be brought within the principle of the latter by special circumstances. It is easy to see that the payment of unpaid debts for operating expenses, accrued within ninety days, due by a railroad company suddenly deprived of the control of its property to operatives in its employ, whose cessation from work simultaneously is to be deprecated, in the interests both of the property and the public, and the payment of limited amounts due to other and connecting lines of road for materials and repairs and for unpaid tickets and freight balances, the outcome of indispensable business relations, where a stoppage of the continuance of such business relations would be a probable result, in case of nonpayment,—the general consequence involving largely, also, the interests and accommodation of travel and traffic,—may well place such payments in the category of payments to preserve the mortgaged property in a large sense, by maintaining the good will and integrity of the enterprise, and entitle them to be made a first lien." ·

The decisions in Finance Co. v. Charleston, C. & C. R. Co., 10 C. C. A. 323, 62 Fed. 205, Wood v. Railroad Co. (C. C.) 70 Fed. 741, and Maryland Steel Co. v. Gettysburg Electric R. Co. (C. C.) 99 Fed. 150, seems also to be pertinent. In Finance Co. v. Charleston, C. & C. R. Co., Mr. Chief Justice Fuller delivered the opinion for the circuit court of appeals of the Fourth circuit, and allowed out of the corpus of the estate an unpaid balance due to certain claims upon accounts accruing before the receiver was appointed. In the course of the opinion he used this language:

"It must be regarded as settled that a court of equity may make it a condition of the issue of an order for the appointing of a receiver of a railroad company that certain outstanding debts of the company shall be paid from the income that may be collected by the receiver, or from the proceeds of sale; that preferential payments may be directed of unpaid debts for operating expenses accrued within 90 days, and of limited amounts due to other and connecting lines of road for materials and repairs and for unpaid ticket and · freight balances, in view of the interests both of the property and of the public that the property may be preserved and disposed of as a going concern, and the company's public duties discharged; and that such indebtedness may be given priority, notwithstanding there may have been no diversion of income, or that the order for payment was not made at the time and as a condition of the receiver's appointment, the necessity and propriety of making it depending upon the facts and ·circumstances of the particular case, and the character of the claims. [Citing cases.] Of course, the discretion to enter such orders should be exercised with great care; but as late as Thomas v. Car Co., 149 U. S. 95, 110, 13 Sup. Ct. 824, 37 L. Ed. 663, the supreme court quoted the remarks upon the doctrine and its proper application in Miltenberger v.

Railroad Co., supra, with approval, although, as observed by this court in Bound v. Railroad Co., 58 Fed. 473, 7 C. C. A. 322, the tendency of that case was to narrow the limits within which an equity court should confine itself in making such allowances."

In Wood v. Railroad Co.,—a case in the circuit court for the district of Massachusetts,—Judge Colt allowed a claim for coupling links, pins, and tank steel furnished within a few months before the appointment of the receiver; and, while the allowance there was not out of the corpus of the estate, the line of argument followed by the opinion supports the conclusion to which I have come in the present case, as may be seen by one or two quotations. For example, in his summary of the cases upon the general subject, he says, on page 743:

"In respect to the payment by receivers of a railroad of pre-existing current debts, as constituting a preference over outstanding mortgage liens, out of current income coming into their hands, or even out of the proceeds of the sale of the property under foreclosure, it may be observed: * * * Sixth, that, independently of the question of diversion [of current income], debts may be preferred which are incurred for labor and supplies necessary to keep the road a going concern from day to day, or which are the outcome of indispensable business relations, a continuance of which involves the interests of the public and the traffic of the road."

And upon page 746 he concludes as follows:

"In Thomas v. Car Co., supra, Mr. Justice Shiras, speaking for the court, observed: 'The case of a corporation for the manufacture and sale of cars, dealing with a railroad company whose road is subject to a mortgage securing outstanding bonds, is very different from that of workmen and employés, or those who furnish from day to day supplies necessary for the maintenance of the railroad.' There is no allegation in this petition of a diversion of current income for the benefit of the mortgagees, and therefore this claim, as now presented, does not come within the principle of diversion laid down in Fosdick v. Schall, supra; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; and St. Louis, A. & T. H. R. Co. v. Cleveland, C. C. & I. R. Co., 125 U. S. 658, 8 Sup. Ct. 1011, 31 L. Ed. 832. It does appear, however, that the materials purchased were coupling links and pins and tank steel, furnished from time to time between September 22 and December 8, 1893; and the petition alleges 'that said supplies were necessary to the operation from day to day of said railroad.' I am of opinion that the petition states a case which brings this claim within that limited class of debts incurred for labor and supplies necessary to keep the road a going concern from day to day, and that it should be held to possess a superior equity over mortgage liens, upon the principle recognized in Miltenberger v. Railroad Co., supra; Finance Co. v. Charleston, C. & C. R. Co., supra; Bound v. Railroad Co., supra; Thomas v. Car Co., supra; Hale v. Frost, 99 U. S. 389, 25 L. Ed. 419."

The case of Maryland Steel Co. v. Gettysburg Electric R. Co. was decided in this circuit by Judge Dallas, and he there allowed out of the corpus of the property a claim for printing tickets before the appointment of the receiver, saying:

"I do not think that the tickets in question were so manifestly superfluous and inappropriate to the business of the railway company as to justify the disallowance of the debt incurred in having them printed. I regard these as having been day by day supplies."

It does not appear from the opinion that the tickets were printed before the receiver was appointed, but I have examined the master's report, and find that such was the fact.

Opposed to the doctrine of these cases is the decision in International Trust Co. v. T. B. Townsend Brick & Contracting Co., 95 Fed. 850, 37 C. C. A. 396,—a decision of the circuit court of appeals for the Sixth circuit, which, upon page 860, 95 Fed., and page 406, 37 C. C. A., lays down the following propositions:

"But, if there has been no diversion of the current income, either before or after the appointment of the receiver, and no surplus income during the receivership, out of which unpaid debts of the income can be paid, upon what theory can the proceeds of a mortgage foreclosure sale be applied to the payment of such debts against the objection of mortgage creditors? If nothing has been diverted from the current-debt fund,—if there has been no augmentation of the fund applicable primarily to the satisfaction of the mortgage creditors,—is there any just or equitable reason for requiring a restoration where nothing has been improperly received? We think in such cases the court has no power to displace contract rights; and neither Fosdick v. Schall, nor any of the cases which have followed it, afford any sufficient authority, when rightly understood, in opposition to this view. These debts of the income are an equitable charge only upon the current income of the mortgaged railroad. If such debts remain unpaid when the railroad passes into the possession of a court of equity, this equitable charge is continued, and attaches to the surplus income arising under the receivership. If this surplus income is not applied to the payment of debts to which it is primarily devoted, but is expended for the benefit of the mortgagee, as in payment of interest, or in the purchase of property which passes under the mortgage, or in betterment of the railroad itself, an equity arises, as a consequence of such diversion, which will justify a court of equity in requiring the mortgagees to restore to the income that which has been taken away. The power of the court to displace mortgage liens in favor of such unsecured debts of the mortgagor depends upon the fact that the current income, either before or after the receivership, has been diverted to the benefit of the displaced mortgage, and the extent to which the corpus of the mortgaged property can be called upon to pay such debts of the income is limited by the amount of the diversion."

The opinion, which is by Judge Lurton, and displays his usual clearness of expression and vigor of argument, has not, however, convinced me that these conclusions are altogether accurate. It may be desirable—I express no opinion upon that point—that the existing rules should be modified in the direction indicated by him, but at present I think the weight of authority is against the view contained in the quotation just made.

No objection was made at the argument that the rule now under consideration should not be applied to the traction company because it did not possess the power of eminent domain (Bound v. Railroad Co. [C. C.] 50 Fed. 314), and therefore I shall not pass upon that question.

I am accordingly of opinion that the claim is superior in equity to the mortgages under which the purchasers' title is derived, and that a decree should be entered directing the purchasers to pay the exceptant's claim.