Argued January 20, affirmed February 23, motion to modify decree of lower court allowed and cause remanded April 19, cost bills disallowed June 8, 1921.

## BARNUM v. SOUTHERN OREGON TRACTION CO. et al.

(195 Pac. 580; 197 Pac. 269; 198 Pac. 520.)

**Receivers—Operating Supplies for Railroad have Priority Over Secured Debt Against Revenues.**

1. Though, as a general rule, a secured debt has priority over a subsequent unsecured debt, there is an exception in the case of a subsequent debt for labor and supplies furnished for the operation of a railroad, based on the advantage to the secured creditor of maintaining the continuous operation of the road and to the public in securing continuous service.

**Receivers—Operating Supplies can be Made Lien if Revenues have been Diverted to Interest.**

2. If the revenues from operation of a railroad have been diverted from the payment for supplies for operating the road to the payment of interest on a secured debt, the payment of the claim for supplies, after the appointment of a receiver, can be enforced by compelling the secured creditor to restore the amount diverted, or by making the claim a lien on the corpus of the property.

**Receivers—Preferences to Operating Expenses Limited to Six Months.**

3. Since the right to priority for supplies furnished for operation of a railroad arises from equitable considerations, and it is equitable that there be a time limit upon such right, the period of

---

1. Liability of railroad in hands of receiver, see note in 5 Am. St. Rep. 313.

six months before the receivership is generally fixed as the period during which supplies furnished may have priority of payment from operating revenues, unless for good reason the court extends the time.

**Receivers—Restoration of Revenue Ordered Only if Diversion Occurred Within Reasonable Time for Preference.**

4. In a suit to have a receiver appointed for a railroad and for foreclosure of a mortgage on the railroad, the mortgagee will be ordered to restore funds diverted from operating revenues to the payment of interest instead of the payment for operating supplies, only if such diversion was made within the period during which the furnishing of supplies gives a preference right.

**Receivers—Operating Creditor Held not Entitled to Preference Because of Delay.**

5. In a suit to foreclose a railroad mortgage, where a power company intervened and asked that its claim for power be given preference over the mortgage, and it appeared that the last interest payment was eight months before the receiver was appointed, and that since that time the operating revenues had exceeded the operating expenses and the interest payment, and that the power company had made no attempt to enforce its claim, the claim will not be given priority over the mortgage.

**Receivers—Usual Six Months for Preference for Supplies not Extended.**

6. Where eight months had elapsed since the last payment of interest on the secured debt of a railroad, during which time the revenues from operation exceeded the operating expenses and the interest paid, but the power company had made no attempt to enforce its claim for power furnished until after the appointment of the receiver at suit of the mortgagee, there is no reason for extending the usual six-month period during which supplies furnished will be given priority against operating revenues.

## ON MOTION TO MODIFY DECREE.

**Receivers—Railroad Income Subject to Preference for Power Furnished Within Six Months.**

7. Decree in suit to foreclose railroad mortgage *held* in view of the pleadings to have adjudged that an intervening company which furnished power for the railroad had no preferential claim, and so to be erroneous; the power company having a preferential right, so far as concerns the power furnished within the six months before the appointment of the receiver, to the net income arising from the receivership; and intervener's petition having stated facts and contained a prayer entitling it to an adjudication of such right, as well as of the right to a preference in the *corpus* of the railroad property.

## ON OBJECTIONS TO COST BILL.

**Costs—Awarded to Neither Party on Modification of Judgment.**

8. In a suit to foreclose a railroad mortgage, involving the question of whether a claim for electric current furnished for light, heat and power, and for supplies used in the operation of a railroad was

entitled to priority over a claim for interest due on a mortgage covering the railroad, where judgment denying power company's claim was reversed, in so far as it denied such claim for power furnished within six months before the appointment of a receiver, to which the company had a preferential right in the net income arising from the receivership, costs will not be awarded to either party on appeal.

From Jackson: FRANK M. CALKINS, Judge.

Department 1.

The question for decision is whether, in the circumstances shown by the record, a claim for electric current furnished for light, heat and power, and for supplies, used in the operation of a railroad is entitled to priority over a claim for interest due on a mortgage covering the railroad.

The Southern Oregon Traction Company, for convenience hereinafter called the traction company, and the California-Oregon Power Company, for brevity hereinafter called the power company, are corporations.

W. S. Barnum owned a line of railway extending from Medford to Jacksonville, and, as we understand the record, the traction company owned some trackage within the City of Medford. On June 26, 1915, Barnum sold and conveyed his line of railway to the traction company for a consideration not shown by the record. However, the traction company did not pay the entire purchase price, but it gave to W. S. Barnum and Bertha S. Barnum its promissory note, dated June 26, 1915, for $57,000, payable on or before July 1, 1921, with interest at 6 per cent payable semi-annually on January 1st and July 1st of each year. The traction company secured its note by giving a mortgage on all the railroad property owned by it. The traction company did not make any payment on the principal of the note, and the last interest payment was made on February 27, 1918,

when the traction company paid to Barnum $1,710 by check drawn on the Jackson County Bank. This check paid the interest in full to January 1, 1918.

At some time not definitely shown by the record, but probably in the latter part of October or possibly early in November, Barnum, who was then the sole owner of the note and mortgage began this suit to foreclose the mortgage. An amended complaint was filed on December 20, 1918, and in the amended complaint the plaintiff prayed among other things, for the appointment of a receiver to take charge of the railroad, to sell it, and to apply the proceeds of the sale on the mortgage debt; and from this fact, plus the language found in the prayer of the power company's complaint in intervention, we infer that the original complaint likewise prayed for the appointment of a receiver.

On November 21, 1918, the power company filed a petition in intervention, alleging that the traction company had been engaged in the operation of the railroad as a carrier of freight and passengers, and that between August, 1917, and November 1, 1918, the power company had furnished to the traction company electric current which was used by the traction company in the operation of its railroad; that the electric current so furnished was reasonably worth $1,696.40; that no payments had been made except $132.90, leaving a balance of $1,563.50. The petition further alleges that during the period beginning with August, 1917, and ending on November 1, 1918, the current earnings of the traction company were sufficient to pay the operating expenses, including the claim of the power company, but that the traction company diverted part of the earnings for the purpose of paying interest due on the mortgage and for the purpose of paying for permanent improvements

to the railroad. The complaint in intervention concluded with a prayer for the appointment of a receiver in accordance with the prayer of the complaint, on condition, however, that the receiver be directed to pay the claim of the power company in full from the earnings of the railroad while operated by the receiver "and if such earnings be insufficient, then from the *corpus* of said property."

Barnum answered the complaint in intervention by denying that the claim of the power company was entitled to preference over the interest due on the note. A receiver was appointed at some time in November, 1918. In one of the briefs it is said that the appointment was made on November 19th. We infer from the evidence that the receiver operated the railroad until about July 1, 1919, when he delivered the property to Barnum, who, it appears purchased the railroad at the foreclosure sale.

The suit came on for trial, and after hearing the evidence the trial court made findings of fact and conclusions of law and on March 10, 1919, rendered a decree in favor of Barnum and against the traction company for $57,000, the amount of the principal of the note, together with $3,990 for interest due from January 1, 1918, and also for attorney's fees, costs, and disbursements; and the decree further provided for the foreclosure of the mortgage and the sale of the mortgaged property.

Among the "findings of fact" is the following:

"The court further finds that the claim of intervener California-Oregon Power Company is not a claim which can attach as superior to that of the plaintiff by virtue of his mortgage."

Among the conclusions of law is the following:

"The court further finds, as conclusions of law, that no judgment or lien should be entered in favor

of the California-Oregon Power Company, intervener, as a preferred claim, and the intervener's complaint in intervention should be dismissed.''

In the decree it is declared that the mortgage held by Barnum is a first and preferred lien. There was a second mortgage of which we need not speak except to say that a corporation known as the Bullis Company had advanced to the traction company from time to time sums of money aggregating $93,000, which amount was secured by a second mortgage on the railroad property. The decree further declares ''that the claim of the California-Oregon Power Company, as intervener herein, be, and hereby is, in all particulars and respects declared to be a valid claim but subordinate and inferior to plaintiff's claim, * * .''

On May 6, 1919, the power company served and filed a notice of appeal in which the power company asserts that it ''appeals to the Supreme Court of the State of Oregon, from that portion of the decree made and entered in the above-entitled cause by the above-named court on the seventh day of March, 1919, wherein and whereby it is adjudged and decreed that the claim of this intervener is subordinate and inferior to plaintiff's claim set out in his complaint herein.''                          AFFIRMED.

For appellant there was a brief over the names of *Mr. Porter J. Neff, Messrs. Morrison, Dunne & Brobeck,* and *Mr. James T. Chinnock,* with an oral argument by *Mr. Neff.*

For respondent there was a brief with oral arguments by *Mr. Gus Newbury* and *Mr. A. C. Emmons.*

HARRIS, J.—The evidence shows that the earnings of the traction company were deposited in the Jack-

son County Bank. Barnum contends that there is evidence showing that the Bullis Company advanced and loaned moneys to the traction company, thus enabling the traction company to operate its railroad, and that the moneys so loaned were also deposited in the Jackson County Bank and commingled with the current earnings, so that it is now impossible to determine whether the interest payment of $1,710 made on February 27, 1918, was made with current earnings or with borrowed moneys. We do not find it necessary to determine what the fact may be, but for the purpose of this discussion we shall assume, without deciding, that the whole sum of $1,710, paid on the interest on February 27, 1918, was made with current earnings.

Although there may be some room for arguing otherwise, nevertheless, we shall assume, without deciding, that all the current earnings were earnings from the operation of the railroad as a public utility: See *Security Trust Co.* v. *Goble R. R. Co.,* 44 Or. 370, 377 (74 Pac. 919, 75 Pac. 697).

1. The general rule, of course, is that a secured debt has priority over a subsequent unsecured debt; but a notable exception to this general rule is found in the doctrine which gives in cases of railroad receiverships priority to unsecured claims for labor or supplies contributing to the maintenance and operation of the railroad. A person taking a mortgage on railroad property is held impliedly to agree that the current debts and liabilities incurred in the ordinary course of the operation of the railroad shall be paid from the current receipts before he has any right to such income. This doctrine is based upon the theory that it is to the interest of the mortgagee that the railroad shall be kept a going concern and thus prevent the impairment of the security of his

claim, and that it is to the interest of the public that the trains which serve the public shall not cease to run.

2. Whenever a labor or supply claimant asserts that the rule which gives his claim priority has been violated, a court of equity will ascertain the amount of the gross earnings and then figure the amount of the current expenses; and if it is found that moneys have been taken from the current earnings and used to pay interest on a mortgage covering the railroad property, and if it is further found that there are not sufficient moneys in the current earnings fund with which to pay such labor or supply claimant, the court will compel the mortgagee to make restoration of so much of the moneys paid on the interest as may be necessary to satisfy the labor or supply claim. Restoration may be accomplished by making the labor or supply claim a lien on the *corpus* of the property, and if the railroad property is sold, such part of the proceeds of the sale as is necessary can be applied in payment of the claim. We understand from the record that the railroad property was sold at a foreclosure sale and that Barnum was the purchaser, and that the sale price did not exceed the amount due on the note and mortgage. We also understand that the power company is attempting to impose a lien on the railroad property so as to compel Barnum to pay the amount of the power company's claim.

3. However, there is a limitation upon this rule under which courts of equity will, when necessary, compel restoration of moneys diverted from the current earnings fund. Since the right of priority arises out of equitable considerations, the right must be accepted and exercised subject to equitable considerations. It is equitable that there shall be a time limit upon the

right of priority, and hence it is said that only those claims which have accrued within a reasonable time before the appointment of the receiver will be given preference over claims for interest due on a mortgage debt; and although there is no arbitrary time fixed, the period of six months is generally prescribed as the time limitation. Of course, for sufficient reasons courts may and will extend the time limitation beyond six months, or fix it at a less period than six months. We shall treat the claim of the power company as one which is clearly entitled to preference, but we are unable to assign any good reason for the extension of the time limitation beyond six months, usually fixed for labor and supply claims: *Blair* v. *St. Louis H. & K. R. Co.* (C. C.), 22 Fed. 471; *Thomas* v. *Peoria R. I. Ry. Co.* (C. C.), 36 Fed. 808, 819; *Central Trust Co.* v. *Clark,* 81 Fed. 269, 271 (26 C. C. A. 397); *International Trust Co.* v. *Townsend Brick & Contracting Co.,* 95 Fed. 850, 857 (37 C. C. A. 696); *Burnham* v. *Bowen,* 111 U. S. 776 (28 L. Ed. 596, 4 Sup. Ct. Rep. 675, see, also, Rose's U. S. Notes); *Southern Ry. Co.* v. *Carnegie Steel Co.,* 176 U. S. 257 (44 L. Ed. 458, 20 Sup. Ct. Rep. 347).

4. The diversion must have occurred within whatever period is adopted as the one during which labor and supply claims must have accrued to be preferred. Restoration will be compelled if the diversion was made within whatever period is adopted as the time limit; but, if the diversion was made before the beginning of such period, restoration will not be compelled: *John A. Roebling's Sons Co.* v. *Idaho Ry. L. & P. Co.,* 243 Fed. 527 (156 C. C. A. 225); 1 Tardy's Smith on Receivers, § 423, p. 1177.

5. There are three statements or bills, exhibits "A," "B," and "C," showing the amount of electric current furnished by the power company. Exhibit

"A" covers light and heat used by the traction company in its office at Medford. Exhibit "B" embraces the light and power used by the traction company at its substation in Medford and also a few supplies furnished; and exhibit "C" includes only the electric current used for lights in Jacksonville. Each of these three statements gives the account from and including the month of May, 1917, to and including the month of October, 1918.

Turning to exhibit "A," we find that the charges for light and heat aggregated $71; that the credits aggregated $68; thus leaving a balance of $3. Exhibit "A" shows that on August 1, 1918, the account balanced, so that it can be said that the unpaid indebtedness of $3 accrued after August 1, 1918.

Upon examination of exhibit "B," we find that from May 1, 1917, to November 1, 1918, the traction company used electric current as follows: For power, $1,976; for supplies, $11.95; for lights, $23.90. The light account ran from 90 cents a month, the lowest, to $2.90, the highest. The power account varied from $92 for the month of March, 1918, to $142 for the month of December, 1917. Supplies were furnished in four several months only. Exhibit "B" shows credits totaling $448.35, leaving a balance of $1,563.50 due and unpaid. However, upon further inspection we find that if we include only the six months immediately preceding November, 1918, there was furnished at the substation during that period electric current as follows: For power, $670; for light, $5.80; and supplies were furnished of the value of $2; and the aggregate value of the electric current and supplies was $677.80. Although the credits for the same period totaled $9.95, we shall assume that these credits should be applied on the unpaid debits which accrued prior to May, 1918.

Exhibit "C" shows debits amounting to $19.80, and credits aggregating $16.80, leaving a balance of $3. This account shows that the traction company was charged $1 per month from and including the month of May, 1917, to and including the month of October, 1918. The last credit was for $6.20 paid July 22, 1918, and the next to the last payment was made February 25, 1918.

If we leave out of our calculations the credits amounting to $9.95 shown in exhibit "B," the total unpaid indebtedness which accrued during the six months period amounts to $683.80. If we now look into the expenses and earnings of the traction company we shall find that the total operating expenses from and including September, 1917, to and including October, 1918, were $22,874.12; and this includes $1,710 paid on February 27, 1918, on the interest, as well as the sum of $452.14 paid in satisfaction of taxes; and the earnings for the same period beginning with September, 1917, and ending with October, 1918, were $21,807.39. But if we calculate the earnings for the six months period beginning with May, 1918, and ending with the following October, we find that they aggregated $10,276.48, and the operating expenses for the same six months period amounted to $6,447.84, thus leaving a net balance in the current earnings fund of $3,828.64, or considerably more than not only the indebtedness accruing for electric current during the six months period but the unpaid indebtedness accruing after May 1, 1917.

6. If we make our calculations so as to cover the period beginning with February, 1918, and ending with the following October, we shall find that the total earnings were $13,923.57, and the total operating expenses were $12,512.78, including $1,710 paid to Barnum on interest; thus leaving nearly enough in

the current earnings fund to pay the total balance due the power company. The record does not show, nor is it claimed, that the power company took any steps or attempted in anywise to compel payment of its claim until it filed its petition in intervention. The attending circumstances, as we view them, argue against rather than for any extension of the usual six months' time limitation.

We are told that the receiver was appointed on November 19, 1918; and, hence, the alleged diversion, which resulted from taking $1,710 out of the current earnings fund on February 27, 1918, and applying it on the interest due on the mortgage, occurred nearly three months prior to the beginning of the six months period, and for that reason the power company can now compel a restoration of the moneys so diverted. The decree is affirmed.

AFFIRMED.   DECREE OF LOWER COURT MODIFIED ON MOTION AND REMANDED.

BURNETT, C. J., and MCBRIDE and BENSON, JJ., concur.

---

Decree of lower court modified on motion April 19, 1921.

## ON MOTION TO MODIFY.

(197 Pac. 269.)

Department 1.

Claiming that it is entitled to a modification of the decree which was entered in the trial court and affirmed by this court (*Barnum* v. *Southern Oregon Traction Co., ante,* p. 652 (195 Pac. 580), the power company has petitioned that the decree be so modified as expressly to declare that a portion of the power company's claim shall be a preferred charge against

the surplus income arising under the receivership. In the original opinion we ruled that the mortgagee cannot be compelled to restore to the current income fund the interest payment made on February 27, 1918, for the reason that the payment was made more than six months prior to the date of the appointment of the receiver. The power company now says that it accepts, without further objection, the ruling expressed by us in the original opinion; but the power company also says that under the terms of the decree the mortgage debt is treated as a prior charge not only against the *corpus* of the railroad property, but also against the "surplus" or "net income" arising under the receivership. Barnum urges that the decree merely declares that the power company's claim cannot be made a preferred charge against the mortgaged property, and that the decree adjudicates no other question.

DECREE OF THE LOWER COURT MODIFIED ON MOTION.

*Mr. Porter J. Neff, Messrs. Morrison, Dunne & Brobeck* and *Mr. James T. Chinnock,* for the motion.

*Mr. Gus Newbury* and *Mr. A. C. Emmons, contra.*

HARRIS, J.—7. The language found in the decree can be better understood if we first direct attention to the pleadings. It will be recalled that at some time in October or November, 1918, Barnum began this suit in foreclosure. In one of the briefs it is said that a receiver was appointed on November 19, 1918. The power company filed a petition in intervention on November 21, 1918, and in its petition the power company alleged, in paragraphs 3, 4 and 5 that between the first day of August, 1917, and the first day of November, 1918, the petitioner delivered

to the traction company electric current for the purpose of light and power in connection with the operation of the railroad; that the electric current so furnished was reasonably worth a stated sum, and that a certain sum was due and unpaid; that "during all said time" the traction company operated the railroad with the electric power and

"said electric current was actually furnished and delivered to the defendant and by it actually used in the operation of said railroad and in lighting its station and office." That "during said period the current earnings of said railroad company were sufficient to pay the operating expenses thereof, including the amount due to the plaintiff as aforesaid, but that said current earnings, instead of being applied to the payment of operating expenses of said railroad, including the amount due plaintiff, were diverted to the defendant company to the payment of interest on the indebtedness due plaintiff to the making of permanent improvements in and additions to said railroad, which were designed to and did increase the value of said property, and consequently the security of plaintiff under its mortgage on the indebtedness due it as alleged in its complaint."

The petition concluded with a prayer that the court appoint a receiver in accordance with the prayer of the plaintiff's complaint

"only on condition that said receiver be directed to pay the claim of this petitioner in full from the earnings of said property while operated by such receiver, and, if such earnings be insufficient, then from the *corpus* of the said property. And further, that said receiver be ordered and directed to so pay said claim of this petitioner as a preferred claim before any payment is made to plaintiff upon its said mortgage, and for such other and further relief as the court may deem just and equitable."

The evidence showed that the electric power was used by the traction company in the operation of its railroad and in lighting its station and office as alleged by the intervener.

It is contended in behalf of Barnum that the petition in intervention is insufficient to show that the claim of the power company is a preferential claim; but we are unable to concur in this contention. The petition recites every ultimate fact necessary for the establishment of a preferential claim against not only the *corpus* of the mortgaged property, but also against the "net income." In other words, if the evidence had supported the petition, Barnum would have been obliged to restore to the current income fund moneys paid on the mortgage debt; but he succeeded in avoiding any obligation to restore when it appeared that the interest payment had been made more than six months before the appointment of a receiver. If the interest payment had been made within six months before the receivership, restoration could have been compelled for the purpose of paying the portion of the power company's claim which had accrued within six months before the appointment of the receiver.

In the original opinion we ruled that the power company's claim belonged to that class of claims which are entitled to preference. In other words, the claim of the power company constituted "a debt of the income" and as such was an equitable charge upon the "current income" of the mortgaged railroad. Whenever such an "equitable charge" upon the "current income" is incurred within a reasonable time before the appointment of a receiver and "remains unpaid when the railroad passes into the possession of the court of equity, this 'equitable charge'

is continued, and attached to the 'surplus income' arising under the receivership'': *International Trust Co.* v. *T. B. Townsend Brick & Contracting Co.*, 95 Fed. 850, 860 (37 C. C. A. 396). See, also, *Burnham* v. *Bowen,* 111 U. S. 776, 782 (28 L. Ed. 596, 4 Sup. Ct. Rep. 675, see, also, Rose's U. S. Notes). If the interest payment had been taken out of the ''current income'' fund at any time within six months prior to the appointment of the receiver, the mortgagee would have been obliged to restore to the ''current income'' fund the moneys received in payment of interest if the ''net income'' in the hands of the receiver was insufficient to pay the power company's claim.

A part of the power company's claim accrued more than six months prior to the appointment of a receiver; and a portion of the claim, aggregating more than $600, accrued within six months before the appointment of a receiver. All that part of the power company's claim which accrued more than six months before the receivership must be treated as general indebtedness without any rights of preference; but the remaining portion which accrued within six months before the receivership must be treated as a preferential claim.

The power company contends that, so far as its claim against the traction company is concerned, the decree of the trial court presents itself in two phases upon this appeal: (1) The relative rights of the power company and Barnum considered with reference to the *corpus* of the mortgaged property; and (2) the relative rights of the power company and Barnum considered with reference to the ''net income'' arising under the receivership. Barnum con-

tends that the appeal presents only the first phase. In our original opinion we decided the first phase and decided it against the power company; and with that decision the power company now says it is satisfied.

The issues arising out of the amended complaint filed by Barnum in the foreclosure suit as well as those arising out of the power company's petition in intervention were all tried and determined in the foreclosure suit. Besides adjudicating the amount due Barnum on the note and decreeing a foreclosure of the mortgage, the decree also adjudicated the claim advanced by the power company in its petition in intervention. The power company appealed from that part of the decree which adjudicated its claim against the traction company.

When the receiver was appointed on December 19, 1918, there were no moneys on hand, and apparently there were no assets except the mortgaged property. Evidently there were no moneys in the hands of the receiver even as late as March 10, 1919, the date when the decree was entered, and consequently the main effort of the power company was to fasten its claim upon the *corpus* of the mortgaged property, while the main effort of Barnum was to prevent the power company's claim from attaching to the *corpus* of the railroad; and the natural result was that but little attention was given by the litigants to the question of paying the power company's claim out of any "net income" which might subsequently arise from the receivership.

The appeal was argued on January 20, 1921; and on that day the power company filed a certified copy of the supplemental report of the receiver. From

this supplemental report it appears that on May 27, 1919, the receiver filed "a final report." The supplemental report was filed on October 16, 1919. In his supplemental report the receiver stated that he had on hand, after paying all expenses of operation, a net balance of $396.16.

Under date of January 22, 1921, Barnum caused to be forwarded to our clerk a certified copy of an order made by the Circuit Court together with a copy of a notice mailed to the attorney for the power company and to other interested attorneys. From these copies it appears that on October 31, 1919, the attorney for Barnum notified the attorney for the power company, as well as other interested attorneys, that he would appear in the Circuit Court on November 12, 1919, and ask for an order directing the receiver to pay to Barnum this sum of $396.16, which remained in the hands of the receiver after the settlement of receivership and operation expenses; and accordingly on November 15th, apparently the earliest date when the matter could be heard, the court, upon motion of Barnum, directed the receiver to pay to Barnum the sum of $396.16 "for the purpose of applying the same upon the plaintiff's unsatisfied judgment." We understand that the power company did not appear in the Circuit Court on November 15, 1919; and, as we understand it, the company declined to appear in response to Barnum's notice for the reason that it took the position that the decree of March 10, 1919, was a final adjudication of the power company's rights. At any rate the power company at this time insists that the decree of March 10, 1919, was an adjudication of all its rights, and that the order of November 15, 1919, was merely in execution

of the decree. Barnum contends, however, that the decree only decided that the claim of the power company could not be fastened upon the *corpus* of the property, and that the order of November 15th adjudicated the rights of all parties with reference to the sum of $396.16, and that, therefore, not having appealed from the order, the power company is precluded from complaining about the disposition made of the $396.16.

The material finding of fact and the important conclusion of law found by the trial court as well as that portion of the decree which the power company appealed from are exemplified in full in the original opinion and need not be repeated here.

In its petition in intervention the power company states enough facts to entitle a portion of its claim to a preference of the "net income," and in its prayer the power company asks "that said receiver be directed to pay the claim of this petitioner in full from the earnings of said property while operated by such receiver * * ." The finding of fact asserts that the intervener's claim is not a claim "which can attach as superior to that of the plaintiff by virtue of his mortgage." The conclusion of law declares: "That *no judgment* or lien should be entered" in favor of the intervener "*as a preferred claim,* and the intervener's complaint in intervention should be dismissed." In the decree the court ruled that the intervener's claim was "subordinate and inferior to plaintiff's claim." In our view the language employed in the finding of fact, conclusion of law, and decree mean that, as between the mortgage debt, on the one hand, and the intervener's claim on the other hand, the intervener's claim is not entitled to any preference rights against either the *corpus* of the

railroad property or the "net income." However, as we have already shown, under the established rule the intervener has a preferential claim upon the "net income" for electric current furnished within six months before the appointment of the receiver. In our view the decree of March 10, 1919, was a final adjudication of the relative rights of the power company and the mortgagee, and the order of November 15, 1919, was simply in execution of the decree: See 3 C. J. 518. Among other assignments of error the power company assigned the following error:

"The court erred in not finding and decreeing that intervener was entitled to have applied on the payment of its claim the net earnings of the railroad while in the hands of the receiver."

As previously explained, the attack made by the power company was directed almost entirely against the *corpus* of the railroad, and the defense made by Barnum was confined to an attempt to protect the mortgaged property against this attack made by the power company; and yet because of the comprehensiveness of the decree the intervener is entitled to a modification of it. The power company is therefore entitled to a modification of the decree so as to give to the power company a preferential right to the "net income" arising from the receivership.

Because of the condition of the record, we do not attempt to decide what rights, if any, the power company has against Barnum on account of the payment of $396.16 to him by the receivership. We merely rule that the decree from which the power company appealed is an adjudication of the relative rights of Barnum and the power company; but we do not attempt to determine whether any subsequent steps were taken properly or improperly.

The decree is modified and the cause is remanded to the Circuit Court for such further proceedings as may be necessary and proper.

AFFIRMED.    DECREE OF LOWER COURT MODIFIED ON MOTION AND REMANDED.

BURNETT, C. J., and McBRIDE and BENSON, JJ., concur.

---

Disallowed June 8, 1921.

ON OBJECTIONS TO COST BILL.

(198 Pac. 520.)

HARRIS, J.—8. Barnum, the respondent, filed a cost bill, claiming that he was entitled to $75, as costs and disbursements. The power company, the intervener and appellant, also filed a cost bill, claiming that it is entitled to $85.06 as costs and disbursements. The power company asserts that it is entitled to costs and disbursements for the reason that on appeal it secured a modification of the decree rendered by the Circuit Court. Barnum insists that he should have his costs and disbursements for the reason that the decree was affirmed as to its principal features and the modification related only to a matter which was collateral and secondary to the main question litigated in the trial court and presented to the appellate court. The facts connected with the litigation and the steps taken or refused to be taken by the respective litigants are set forth in our opinions heretofore rendered: *Barnum* v. *Southern Oregon Traction Co., ante,* p. 652 (195 Pac. 580, 197 Pac. 269); and we think that the circumstances attending this suit are such as to make it proper to refuse to allow costs and dis-

bursements to either party. We direct that the decree shall be without costs or disbursements to either litigant. Both cost bills are disallowed.

DISALLOWED.

BURNETT, C. J., and McBRIDE and BENSON, JJ., concur.